## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## GREENVILLE DIVISION

UNITED STATES OF AMERICA
*ex rel.*
[UNDER SEAL]

Civil Action No.

Relator

**TO BE FILED IN CAMERA AND UNDER SEAL**

vs.                                    DO NOT PUT IN PRESS BOX
                                       DO NOT ENTER ON PACER

[UNDER SEAL]

Defendants.

## DOCUMENT TO BE KEPT UNDER SEAL

## DO NOT ENTER ON PACER

Bill Nettles
Fran Trapp
Law Offices of Bill Nettles
2018 Lincoln Street
Columbia SC
29201

Lead Counsel:
Bryan Vroon
(Motion for *pro hac* admission to be filed)
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1380 West Paces Ferry Road
Suite 2270
Atlanta Georgia 30327

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

UNITED STATES OF AMERICA
*ex rel.*
DANIEL E. LEE, M.D.

       CASE NO.
Relator

         Case No.

        **TO BE FILED IN**
        **CAMERA AND UNDER SEAL**

vs.        DO NOT PUT IN PRESS BOX

        DO NOT ENTER ON PACER

ST. FRANCIS PHYSICIAN SERVICES, INC.;
BON SECOURS ST. FRANCIS HEALTH SYSTEM, INC.;
BON SECOURS MEDICAL GROUP;
BON SECOURS HEALTH SYSTEM, INC.;
ST. FRANCIS HOSPITAL, INC. (D/B/A ST. FRANCIS DOWNTOWN,
ST. FRANCIS EASTSIDE, AND ST. FRANCIS MILLENNIUM);
and JOHN DOES 1-100.

Defendants.

## Relator's Complaint Under the False Claims Act

**Introduction to the Scheme to Reward Patient Referrals** .......................................... 4

**Parties**.......................................................................................................................... 8

**Jurisdiction and Venue** ............................................................................................. 11

**Introduction to Federal *Stark* Laws** ....................................................................... 12

**Bon Secours' Strategy to Increase Orthopedic Admissions and
Procedures Profitable for the Hospital System**.................................................... 14

    **Background to the Employment Agreements with POA Orthopedic Surgeons**......... 15

    **Terms of the Employment Agreements with POA Orthopedic Surgeons** ................... 16

    **Introduction to Annual Bonus Pool Payments**....................................................... 20

    **The Bonus Pool Incentivized the Surgeons to Generate Referrals to the
Hospital System**....................................................................................................... 22

    **Bonus Supplement Increased to $3.95 Million Per Year with 12-Year
Commitment**............................................................................................................. 22

    **Amended Employment Agreements Locked the Physicians Into 12-Year
Term** ........................................................................................................................ 23

    **Defendants Ignored the Compensation Limits in the Employment
Agreements**............................................................................................................... 24

    **Excessive Payments to the Orthopedic Surgeons** .................................................. 25

        Dr. Jennings ............................................................................................................ 26

        Dr. Kavolus ............................................................................................................. 27

        Dr. Ridgeway .......................................................................................................... 27

        Dr. Tollison ............................................................................................................. 28

        Dr. Womack............................................................................................................. 28

        Dr. Baumgarten....................................................................................................... 28

        Dr. Vann.................................................................................................................. 29

        Dr. Koch.................................................................................................................. 29

        Dr. Paylor ................................................................................................................ 30

        Dr. Lucas................................................................................................................. 30

        Dr. Van Pelt ............................................................................................................ 31

        Dr. Batson ............................................................................................................... 31

        Dr. Tanner ............................................................................................................... 32

        Dr. Jernigan............................................................................................................. 33

    **Supplemental Bonus Payments Have Been Budgeted and Disguised as
Revenues**.................................................................................................................. 33

    **The POA Orthopedic Surgeons Do Not Satisfy "Group Practice" Exception**

Under *Stark* Laws................................................................................................ 34

**Compliance with *Stark* Is Condition of Each Federal Payment**.............................. 36
Compliance with *Stark* is Condition of Each Medicare Payment ...................................... 36
Compliance with *Stark* is Condition of Each Medicaid Payment....................................... 40
Compliance with *Stark* is Condition of Each TRICARE Payment ..................................... 43

**The False Claims Act** ............................................................................................ 45

**Count I---Presenting or Causing False Claims in Violation of 31 U.S.C. § 3729(a) (1)(A) Against All Defendants** .................................................... 46

**Count II--- Use of False Statements in Violation of 31 U.S.C. 3729(a)(1)(B) Against All Defendants**.............................................................. 47

**Count III--- Conspiring to Submit False Claims in Violation of 31 U.S.C. § 3729(a)(1)(C) Against All Defendants**.......................................................... 48

**Count IV---Submission of Express and Implied False Certifications in Violation of 31 U.S.C. § 3729(a)(1)(B) Against All Defendants** ........................... 50

**Count V---Knowingly Causing and Retaining Overpayments in Violation of 31 U.S.C. § 3729(a)(1)(G) Against All Defendants**.................................... 50

**Count VI--- False Record to Avoid an Obligation to Refund Against All Defendants** ...................................................................................................... 52

**Prayers for Relief**................................................................................................. 52

**Certificate of Service**............................................................................................ 53

## Introduction to the Scheme to Reward Patient Referrals

1.  Under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended ("FCA"), Relator Daniel E. Lee, M.D. states his Complaint against St. Francis Physician Services, Inc., Bon Secours St. Francis Health System, Inc., Bon Secours Health System, St. Francis Hospital, Inc. (d/b/a St. Francis Downtown, St. Francis Eastside, and St. Francis Millennium) and Bon Secours Medical Group (collectively referred to as "the Bon Secours Defendants") and John Does 1-100 filed under seal with the Court as follows.

2.  This *qui tam* case is brought against the Bon Secours Defendants for knowingly defrauding the federal government in connection with Medicare, Medicaid, TRICARE, and other government health care programs. Since at least 2006, the Bon Secours Defendants

have engaged in a scheme to pay excessive compensation to employed orthopedic surgeons who generated significant referrals to the hospital system. The Defendants' scheme has deliberately violated federal *Stark* laws.

3.     In approximately 2006, Piedmont Orthopedic Associates ("POA") was in the process of obtaining a certificate of need for operating an outpatient surgery center. In terms of patient volumes and physician numbers, POA was the leading group of orthopedic surgeons practicing in the Greenville region.

4.     Saint Francis Hospital had just completed an ambulatory surgery center at their main campus that was underutilized. St. Francis executives did not want competition for patients from POA operating an outpatient surgery center. They also wanted POA's physicians to refer their patients for surgeries to St. Francis Hospital and the St. Francis ambulatory surgery center.  Consequently, they developed a strategy to lure the POA surgeons into becoming employees of the hospital system by paying them excessive compensation, including an annual bonus pool.

5.     Since 2008, the annual bonus pool has been composed of two components: (1) net professional revenues of the medical practice physician employees and nurse practitioner employees, and (2) a $3.95 million supplemental bonus payment each year from St. Francis Physician Services.

6.     Under the employment terms, if the orthopedic surgeons' had net losses of less than $3.95 million each year, then they would receive a supplemental bonus payment of $3.95 million each year to be divided among them.

7.    These bonus pool payments were in addition to payments to each physician based on work relative value units ("wRVUs").[1]

8.    Over the 14-year term of the Employment Agreements from 2006-2020, St. Francis Physician Services committed to paying at least $53.4 million in supplemental bonus payments **in addition** to giving the physicians $75.00 per WRVU and giving the physicians the net professional revenues of the physician employees and nurse practitioner employees.

9.    St. Francis' executives offered and agreed to physician compensation terms that they knew were guaranteed to lose tens of millions of dollars over the 14-year term of the contracts unless they considered revenues from the physicians' patient referrals to the hospital system.

10.    The criteria used to determine whether the $3.95 million bonuses were paid each year incentivized and rewarded the physicians for generating referrals to the hospital system for physical therapy, laboratory, radiology, and other ancillary services. In calculating losses or gains of the practice, "Net charges are determined based on actual payments received for that month and YTD as a percentage of gross charges (gross charges produced by physicians, nurse practitioners, physician assistants, physical therapists) as well as in-office laboratory & radiology and other in-office ancillary procedures as they may change from time-to-time." Employment Agreement, Exhibit 4.1.1, Par. 3, page 23. Therefore, net charges included physical therapy, laboratory, radiology, and other

---

[1]  The most common measure of physician productivity is work relative value units (wRVUs). These units reflect the level of time, skill, training, and intensity required of a physician to provide a given service. These units are the leading method for calculating the volume of work or effort expended by a physician in treating patients. Under this relative scale, a physician seeing two or three complex or high acuity patients per day would accumulate more RVUs than a physician seeing lower acuity patients each day.

"ancillary procedures." These charges did not represent the orthopedic surgeons' personal or supervised services, but rather revenues from their referrals to the hospital system.

11.     The physicians' were incentivized to order physical therapy, laboratory, radiology, and other "ancillary procedures." The more they ordered, the higher the net charges credited to the practice, the lower the losses from their practice, and the more likely they would receive a $3.95 million supplemental bonus payment each year.

12.     In implementing this financial strategy, St. Francis executives calculated that the excessive compensation to the orthopedic surgeons would be more than offset by increased revenues from their lucrative referrals to the hospital system.

13.     Federal *Stark* laws prohibit the United States from paying for designated health services ("DHS") referred by physicians who have improper financial relationships with the DHS provider or hospital. In addition to prohibiting the hospital from submitting claims under these circumstances, the *Stark* laws also prohibit payments by federal health care programs of such claims: "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. §1395nn (g)(1).[2]

14.     Under *Stark* laws, a hospital employing and paying a physician who refers Medicare and Medicaid patients must satisfy the four statutory requirements for "bona fide employment relationships": (1) the "employment is for identifiable services," (2) "the

---

[2] "Designated health services" include "any of the following items or services: "clinical laboratory services, physical therapy services, occupational therapy services, radiology services...radiation therapy services and supplies, durable medical equipment and supplies, parenteral and enteral nutrients, equipment and supplies, prosthetics, orthotics and prosthetic devices and supplies, home health services, outpatient prescription drugs, inpatient and outpatient hospital services." 42 U.S.C. §1395nn (h)(6).

amount of the remuneration under the employment...is consistent with the fair market value of the services" personally provided by the physician, (3) the remuneration "is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician," and (4) "the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. § 1395nn (e)(2). The Bon Secours Defendants have repeatedly violated these requirements of federal law and excessively paid orthopedic surgeons based in part on revenues from their referrals to the hospital system.

15.     The Defendants' scheme has caused major damages to federal health care programs, including patients covered under Medicare, Medicaid, or TRICARE in addition to federal employees and retired federal employees. Since 2013, St. Francis Hospital has received over $568 million from the Medicare Program. Medicare payments account for approximately 22 percent of the hospital system's net revenues each year.

16.     A significant portion of such Medicare payments derived from inpatient and outpatient referrals by orthopedic surgeons receiving excessive payments from the Bon Secours Defendants in violation of *Stark* laws. Between 2012 and the present, the Defendants submitted thousands of false claims arising from such referrals both for specific services provided to beneficiaries of federal health care programs and claims for general and administrative costs incurred in treating such beneficiaries.

## Parties

17.     Relator Daniel Lee, M.D. is an orthopedic surgeon in private practice in Greenville, South Carolina. He has practiced medicine in Greenville, South Carolina since his training

internship and residency at Greenville Memorial Hospital System from 1988-1993. He graduated from Medical University of South Carolina in 1988 and has been licensed to practice medicine in South Carolina since 1988.

18.    From approximately 2007-2010, Defendant St. Francis Physician Services employed Dr. Lee as an orthopedic surgeon. He served as Chief of Orthopedics at Bon Secours St. Francis Health System from approximately 2007-2008 during his employment. He continues to hold privileges at St. Francis Hospital. He also has privileges at Greenville Hospital System, Regency Hospital Company, and AnMed Cannon Memorial Hospital.

19.    Through his work and experience, Dr. Lee has direct, detailed, and personal knowledge that the Bon Secours Defendants have violated *Stark* laws in their excessive payments to employed orthopedic surgeons based in part on the value of their referrals to the hospital system.

20.    Defendant Bon Secours St. Francis Health System operates a major healthcare system in the Greenville region, including hospitals, outpatient and ambulatory surgery centers, physician offices, and multiple clinics and facilities. Defendant Bon Secours St. Francis Health System, Inc. is organized as a tax-exempt "charitable" entity under Section 501(c)(3) of the Internal Revenue Code and has its principal place of business located at One St. Francis Drive, Greenville, SC 29601. Bon Secours St. Francis Health System, Inc. is the parent organization of the local healthcare system and is controlled by Defendant Bon Secours Health System, Inc.

21.    Defendant St. Francis Hospital, Inc. is a part of the Bon Secours St. Francis Health System and organized as a tax-exempt "charitable" entity under Section 501(c)(3) of the Internal Revenue Code. St. Francis Hospital includes St. Francis Hospital Downtown, St.

Francis Eastside, and St. Francis Millennium. St. Francis Downtown includes a 245-bed hospital and the St. Francis Outpatient Center. St. Francis Eastside was formerly known as St. Francis Women's & Family Hospital. St. Francis Eastside includes a 93-bed hospital and two medical office buildings. St. Francis Millennium includes a fitness center, weight loss center, sleep center, cardiac testing, outpatient rehabilitation, laboratory, radiology, and physician offices.

22.    Defendant St. Francis Physician Services, Inc. ("SFPS") is organized as a tax-exempt "charitable" entity under Section 501(c)(3) of the Internal Revenue Code and has its principal place of business located at One St. Francis Drive, Greenville, SC 29601. Bon Secours St. Francis Health System, Inc. controls SFPS and uses this entity to employ physicians within the health system, including but not limited to primary care physicians, urgent care physicians, and orthopedic surgeons.

23.    Defendant Bon Secours Health System, Inc. has its headquarters located at 1505 Marriottsville Road, Marriottsville, MD 21104. Bon Secours Health System, Inc. is the parent organization that provides management oversight over Bon Secours St. Francis Health System, Inc. and its subsidiaries.

24.    Defendant Bon Secours Medical Group is a network of physicians and practitioners employed within the Bon Secours St. Francis Health System. Bon Secours Medical Group has provided financial, accounting, and management services to the orthopedic surgeons employed by St. Francis Physician Services.

25.    The identities of the remaining Doe defendants who knowingly submitted or caused the submission of false claims to the United States are presently unknown to Relator. All listed Defendants and such additional Doe defendants have served as contractors, agents,

partners, and/or representatives of one and another in the submission of false claims to the United States and were acting within the course, scope and authority of such contract, conspiracy, agency, partnership and/or representation for the conduct described below.

## Jurisdiction and Venue

26.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

27.     Personal jurisdiction and venue are proper in this District under 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), as Defendants transacted business or otherwise engaged in illegal conduct at issue within the District.

28.     Section 3732(a) of the False Claims Act provides, "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

29.     This action arises under the provisions of Title 31 U.S.C. § 3729, *et seq*, popularly known as the False Claims Act which provides that the United States District Courts shall have exclusive jurisdiction over actions brought under that Act.

30.     This action seeks recovery under the False Claims Act for violations of *Stark* laws with respect to Defendants' claims for payments by federal health care programs.

31.     Prior to filing this case, Relator, through his counsel, delivered a draft copy of the Complaint and his written Disclosure of substantially all material evidence and information in his possession to the United States Attorney's Office for the District of South Carolina and the United States Attorney General's Office.

## Introduction to Federal *Stark* Laws

32.   Enacted in 1989 to contain health care costs and reduce conflicts of interests, the *Stark* laws generally prohibit physicians from referring[3] their Medicare patients to business entities, such as hospitals or laboratories, with which the physicians or their immediate family members have a "financial relationship." 42 U.S.C. §1395nn(a)(1); *see* generally 42 C.F.R. §§ 411.350-.389 ("Subpart J---Financial Relationships Between Physicians and Entities Furnishing Designated Services").  Subsequent amendments later extended certain aspects of *Stark* Laws to Medicaid patients. *See* 42 U.S.C. §1396b(s).

33.   The statute and regulations further prohibit any entity from submitting a Medicare claim for services rendered pursuant to a prohibited referral, 42 U.S.C. §1395nn(a)(1)(B); 42 C.F.R. §411.353(b), prohibit Medicare from paying any such claims, 42 U.S.C. §1395nn(g)(1); 42 C.F.R. §411.353(c), and require an entity that receives payment for such a claim to reimburse the funds to the United States, 42 C.F.R. §411.353(d).

34.   The *Stark* laws define a "financial relationship" to include a "compensation arrangement," 42 U.S.C. §1395nn(a)(2), which means "any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and an entity." *See* 42 U.S.C. §1396nn(H)(1)(A).

---

[3]  The *Stark* Statute defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn (h) (5) (A).  The accompanying regulations also broadly define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service . . . ." 42 C.F.R § 411.351. A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

35.    In turn, "remuneration" is broadly defined to include "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. §1395nn(h)(1)(B); *see also* 42 C.F.R. §411.351 ("Remuneration means any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind").

36.    Congress enacted the *Stark* Statute in two parts, commonly known as *Stark I* and *Stark II.*  Enacted in 1989, *Stark I* applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

37.    In 1993, Congress extended the *Stark* Statute (*Stark II*) to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.  As of January 1, 1995, *Stark II* applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services": (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services. *See* 42 U.S.C. § 1395nn(h)(6).

38.    Any remuneration or benefit given by a hospital to a physician must be based solely on the physician's personal labor. In pertinent part, the statutory language focuses on "the fair market value of the services" personally performed by the physician.  42 U.S.C.S. § 1395nn (e)(2). The *Stark* laws prohibit a hospital from offering or giving remuneration or

benefits to referring physicians "in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." 42 U.S.C.S. §1395nn(e)(2).

39.    The *Stark* laws also require that physician remuneration must be "provided pursuant to an agreement which would be commercially reasonable even if no referrals were made" to the hospital. 42 U.S.C.S. § 1395nn (e)(2).

40.    A hospital employing a physician who makes referrals to that hospital of Medicare and Medicaid patients must satisfy the statutory requirements for "bona fide employment relationships." Under the *Stark* laws, a "bona fide employment relationship" must satisfy the following four relevant requirements: (1) the "employment is for identifiable services," (2) "the amount of the remuneration under the employment...is consistent with the fair market value of the services" personally provided by the physician, (3) the remuneration "is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician," and (4) "the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. § 1395nn (e)(2).

41.    The Bon Secours Defendants have repeatedly violated these requirements of *Stark* laws.

42.    Once the plaintiff or the government has established proof of each element of a *Stark* violation, the burden shifts to the defendant to establish that the conduct was protected by an exception. If no exception applies to a *Stark* violation, then all referrals from the referring physician to the DHS entity or hospital are subject to prohibition.

**Bon Secours' Strategy to Increase Orthopedic Admissions and Procedures**

**Profitable for the Hospital System**

**Background to the Employment Agreements with POA Orthopedic Surgeons**

43.    As mentioned above, in approximately 2006, Piedmont Orthopedic Associates ("POA") was in the process of obtaining a certificate of need for operating an outpatient surgery center. In terms of patient volumes and numbers of physicians, POA was the leading group of orthopedic surgeons practicing in the Greenville region.  At that time, POA was negotiating with HealthSouth to purchase the surgery center called Piedmont Surgery Center.

44.    Saint Francis Hospital had just completed an ambulatory surgery center at their main campus that was underutilized. St. Francis executives did not want competition for patients from POA surgeons operating an outpatient surgery center. They also wanted POA's physicians to bring their patients for surgeries to St. Francis Hospital and the St. Francis ambulatory surgery center.  Consequently, they developed a strategy to lure the POA surgeons into becoming employees of the St. Francis system by paying them excessive compensation.

45.    When POA surgeons became employees of St. Francis Physician Services instead of purchasing the surgery center, Dr. Lee led a group of physicians attempting to buy the surgery center. Dr. Lee was the only orthopedic surgeon in the group. The other physicians were ophthalmologists and ENT physicians.

46.    In the midst of this effort to buy the surgery center, St. Francis executives recruited Dr. Lee and offered him employment with the St. Francis system and a position as Chief of Orthopedics at Bon Secours St. Francis Health System.

47.    From approximately 2007-2010, Defendant St. Francis Physician Services employed Dr. Lee as an orthopedic surgeon. He served as Chief of Orthopedics at Bon Secours St. Francis Health System from approximately 2007-2008.

48.    After St. Francis hired him, Dr. Lee witnessed the unusual power that POA surgeons exerted within the St. Francis system, including the right of first refusal with respect to any new orthopedic surgeons hired by St. Francis.

49.    Dr. Lee voluntarily left St. Francis Physician Services in 2010 to return to independent practice. But the POA orthopedic surgeons have remained as employees of St. Francis under an extraordinary 14-year compensation package that extends through 2020.

### Terms of the Employment Agreements with POA Orthopedic Surgeons

50.    In approximately 2006, Defendant St. Francis Physician Services, Inc. entered into a Physician Employment Agreement with each orthopedic surgeon of POA. Each Employment Agreement with each orthopedic surgeon was similar in substance, terms, and compensation structure.  During the years in question, there have been 16 POA orthopedic surgeons employed by St. Francis Physician Services.

51.    The Employment Agreement begins by stating St. Francis Physician Services is "affiliated with St. Francis Hospital, Inc. ('St. Francis') and St. Francis Women's and Family Hospital ('Women's Hospital' and, together with St. Francis Hospital, the "Hospitals") and, in connection therewith, operates a medical practice (the 'Medical Practice') and employs physicians to provide medical care to patients." Physician Employment Agreement, Background, Paragraph A, p. 1.

52.     The Employment Agreement provided that each orthopedic surgeon "shall be subject to the general supervision and direction of the Employer, acting by and through its Board of Directors and the duly authorized officers of the Hospitals." Physician Employment Agreement, Par. 1.1.   The officers of St. Francis Hospital and St. Francis Women's Hospital have had the contractual authority to supervise and direct each orthopedic surgeon.

53.     Under the Employment Agreement, each orthopedic surgeon was required to "devote Physician's entire working time to the Hospitals and the medical practice." Employment Agreement, Par. 1.4.1.

54.     Each orthopedic surgeon was contractually required to "promote and enhance the efficient operation and functioning of the Hospitals and the Medical Practice." Employment Agreement, Par. 2.1.

55.     Each orthopedic surgeon was required to follow the "Hospitals' procedures for the timely completion of accurate records, reflecting the time spent furnishing the Physician's services." Employment Agreement, Par. 2.4.2.

56.     Each orthopedic surgeon relinquished the right to bill and collect for his or her professional services. "All fees or other income attributable to the professional services rendered by Physician in the course of Physician's employment by Employer shall be the income of the Employer and Physician hereby assigns the same to Employer." Employment Agreement, Par. 2.5. "Employer shall have the right to bill for, collect, and retain any and all revenues for patient care services rendered by Physician hereunder." *Id.*

57.     Under the Employment Agreements, each orthopedic surgeon was required to refer all patients to the St. Francis system except in limited circumstances. Each orthopedic

surgeon was required to "utilize services available from Employer." Employment Agreement, Par. 2.6. "Physician shall utilize the services of facilities other than Employer only when such services are (i) medically necessary, as determined by Physician and appropriate and are in the patient's best medical interest, (ii) required by the terms of a patient's enrollment or participation in an insurance or other health care plan, or (iii) requested by patient." *Id.*

58.    The Employment Agreement further required each orthopedic surgeon to "participate in those managed care contracts selected by Employer, including, without limitation, all group contracts held by Employer." Employment Agreement, Par. 2.7. "Without the prior written approval of Employer, Physician may not enter into managed care contracts other than through a group contract of Employer." *Id.*

59.    The Employment Agreement required that each orthopedic surgeon "shall be certified to participate in Medicare, Medicaid, Tricare and other federal health programs…" Employment Agreement, Par. 1.2.2. The Employment Agreement also required each orthopedic surgeon to "comply with all federal and state statutes, regulations, and rules pertaining to Medicare, Medicaid, Tricare and other federal and state program reimbursement…" Employment Agreement, Par. 2.9.

60.    The Employment Agreement also confirmed that all non-physician staff working at the medical practice were employees of St. Francis Physician Services, Inc. or the Hospitals. Employment Agreement, Par. 2.13.3.

61.    Each orthopedic surgeon was also required to participate in "developing a schedule for ensuring prompt and predictable availability of medical services at the Hospitals." Employment Agreement, Par. 2.13.8.

62.    The Employment Agreement also prohibited each orthopedic surgeon from soliciting the services of any employee of Employer or the Hospitals during "the term of this Agreement." Employment Agreement, Par. 5.3.

63.    The original Employment Agreement for each orthopedic surgeon had an effective date of September 1, 2006 and "shall continue for a term of ten (10) years." Employment Agreement, Par. 3.1.

64.    The Employment Agreement required St. Francis Physician Services to pay extensive benefits for the orthopedic surgeons as described in Exhibit 4.2, including "all reasonable and necessary out-of-pocket expenses incurred by Physician," (Paragraph 4.3), professional liability coverage (Par. 4.5), and "appropriate office space and support staff." (Par. 4.6).

65.    Each orthopedic surgeon also entered into a Medical Records Custody Agreement and Business Associate Agreement with St. Francis Physician Services, Inc. effective September 1, 2006 for the confidentiality of patients' protected health information.

66.    The compensation and productivity payments were referenced in Paragraph 4.1.1 and provided in Exhibit 4.1.1 to the Employment Agreement.

67.    The Employment Agreements for each orthopedic surgeon provided for base compensation, productivity compensation, and bonus compensation.

68.    For each surgeon's "initial 12 months of employment, the annual Base Compensation amount will be 70% of the greater of Physician's total actual compensation as reflected on Physician's IRS Form W-2 for 2004 or 2005." Employment Agreement, Exhibit 4.1.1, Par. 1, page 19. "For subsequent years of employment, which shall be the

annual base compensation is 70% of the previous year's actual total physician compensation (W2 salary) annualized as necessary to comprise twelve (12 months)." *Id.*

69.    Each surgeon's productivity compensation "shall be calculated…on the basis of actual Work Relative Value Units (WRVU's) attributable to services personally performed by Physician each month multiplied by the appropriate WRVU conversion factor and subtracting from the product thereof the monthly Base Compensation paid to Physician." Employment Agreement, Exhibit 4.1.1, Par. 2, page 19.  "The remainder, if positive, is the amount of Productivity Compensation to be paid for such month."

70.    "In calculating Productivity Compensation, Employer shall use the following orthopaedic specialty WRVU conversion factors in respect of the WRVU's performed during the month in question." Employment Agreement, Exhibit 4.1.1, Par. 2, page 20. The original agreed conversion factor was $64.00 per WRVU for all orthopedic specialties regardless of physician credentials or experience and regardless of collections for the physicians' services. In September of 2008, St. Francis increased the compensation conversion factor to $75.00 per WRVU for all physicians of POA regardless of credentials or experience and regardless of collections for the physicians' services.

**Introduction to Annual Bonus Pool Payments**

71.    Under the Employment Agreements, St. Francis Physician Services, Inc. also committed to paying the orthopedic surgeons "bonus compensation based on practice financial performance." Employment Agreement, Exhibit 4.1.1, Par. 3, page 20. Each orthopedic surgeon "shall receive a percentage share of the Bonus Compensation Pool equal to Physician's percentage share of the productivity of the Medical Practice, as measured in WRVU's." *Id.*

72.     "The amount of the Bonus Compensation Pool shall be determined as follows: Employer shall (i) subtract from the aggregate collected professional revenues of the Medical Practice Physicians and Medical Practice Nurse Practitioner Employees, as defined herein, any and all direct and indirect expenses incurred by the Medical Practice as set forth on Exhibit 4.1.1(a) with the exception of hard asset rent payment[4] and (ii) add to the remainder a practice loss adjustment factor of $3,000,000.00 per year or such other amount as mutually agreed to by the parties." Employment Agreement, Exhibit 4.1.1, Par. 3, page 21.

73.     Under Exhibit 4.1.1(a), "Employer shall use an adjustment factor in calculating the Bonus Compensation Pool amount; the adjustment factor is the amount of the net loss target deems acceptable for the Medical Practice for a given fiscal year." "The Bonus Compensation Pool is calculated in a manner that funds such pool in the event the actual net loss for the Medical Practice is less than the target set by employer for such year." *Id.* "The net loss target is $3,000,000.00 per year during the term of contract or such other amount as mutually agreed to by the parties." *Id.*

74.     Under the original terms, if the overall practice had net losses of less than $3 million, then the physicians would receive a supplemental bonus payment of $3 million each year to be divided among them. Over the original 10-year term of the Employment Agreements from 2006-2016, St. Francis Physician Services committed to paying $30

---

[4]  In October of 2009, St. Francis Physician Services and the orthopedic surgeons amended the Employment Agreement again to provide that St. Francis' lease payments for medical equipment in excess of 6 percent of the surgeons' total practice revenue "shall now be included in the expenses of the Medical Practice for purposes of the calculation of the fiscal year-end financial performance bonus." Second Amendment to Physician Employment Agreement, "Recitals," p. 1.

million in supplemental bonus payments to the orthopedic surgeons if the financial losses from their practice were less than $3 million each year.

### The Bonus Pool Incentivized the Surgeons to Generate Referrals to the Hospital System

75.    The criteria used to determine whether the $3 million supplemental bonuses were paid each year incentivized and rewarded the physicians for generating referrals to the hospital system for physical therapy, laboratory, radiology, and other ancillary services. In calculating losses or gains of the practice, "Net charges are determined based on actual payments received for that month and YTD as a percentage of gross charges (gross charges produced by physicians, nurse practitioners, physician assistants, physical therapists) as well as in-office laboratory & radiology and other in-office ancillary procedures as they may change from time-to-time." Employment Agreement, Exhibit 4.1.1, Par. 3, page 23. Therefore, net charges included laboratory, radiology, physical therapy, and other "ancillary procedures." These charges did not represent the orthopedic surgeons' personal services, but rather revenues from their referrals to the hospital system.

76.    The physicians' were incentivized to order physical therapy, laboratory, radiology, and ancillary services. The more they ordered, the higher the net charges credited to their practice, the lower the losses from their practice, and the more likely they would receive and share a $3.0 million supplemental payment each year into the physician bonus pool.

### Bonus Supplement Increased to $3.95 Million Per Year with 12-Year Commitment

77.    Despite the ten-year term of the original Employment Agreements entered in 2006, St. Francis Physician Services agreed to amend the Employment Agreements in 2008 to

increase the surgeons' compensation per WRVU from $64.00 to $75.00 and to increase their supplemental bonus payments each year from $3.0 million to $3.95 million.

78.    Under the First Amendment to Physician Employment Agreement, if the orthopedic surgeons' practice losses were less than $3.95 million each year, then they would receive an annual bonus payment of $3.95 million. *See* First Amendment to Physician Employment Agreement, Par. 6.

79.    The First Amendment also extended the term of the deal, including the bonus payments, for 12 years from September 1, 2008 through September 1, 2020.

80.    Over the 12-year term, St. Francis Physician Services committed to paying the orthopedic surgeons $47.4 million in supplemental bonus payments in addition to the $6.0 million paid in the prior two years.

81.    In guaranteeing over $50 million in supplemental bonus payments, St. Francis Physician Services induced the physicians to enter into a 14-year term of employment with 14 years of patient referrals to the Bon Secours St. Francis Health System.

**Amended Employment Agreements Locked the Physicians Into 12-Year Term**

82.    The First Amendment also restricted the orthopedic surgeons' options to terminate the Employment Agreements and prohibited the physicians from leaving St. Francis to practice medicine in six different South Carolina counties. *See* First Amendment, Par. 3. The First Amendment added Section 3.2.2.3 which addressed when the orthopedic surgeons may terminate the Employment Agreement: "Upon twenty-four (24) months prior written notice to Employer in the event that Physician is either: (a) permanently retiring from the practice of medicine; or (b) relocating his medical practice outside of the

following South Carolina counties: Greenville, Anderson, Spartanburg, Pickens, Laurens and Buncombe."

83.     The First Amendment locked the orthopedic surgeons into a 12-year employment term in which they could realistically only terminate the Agreement if they retired from practicing medicine or moved outside of the region.[5]

**Defendants Ignored the Compensation Limits in the Employment Agreements**

84.     The original Employment Agreement contains a "total compensation limitation" for each orthopedic surgeon. "Notwithstanding the provisions of Section 2 above, except as provided herein Physician Total Compensation in any year shall not exceed the 90th percentile level for total compensation for Physician's specialty as published by the Medical Group Management Association ('MGMA') Southern Region for the most recent year available." *See* Employment Agreement, Exhibit 4.1.1, p. 21.   "In the event Physician's total patient encounters (WRVU'S) for a given fiscal year exceed the total patient encounters associated with the 90th percentile level referenced above, Employer will present and review such matter with appropriate internal committee(s)."

---

[5]  In addition the original Employment Agreement provided that the physicians could only terminate the Agreement if St. Francis Physician Services failed to cure a material breach after 30 days written notice or in event of "administrative change in employment involving the CEO Bon Secours St. Francis Health System and/or Executive Vice President of St. Francis Physician Services, Inc." *See* Employment Agreement, Section 3.2.2.1 and Section 3.2.2.2. If there was such an administrative change, the physician was required to give 365 days notice of termination.

85.     St. Francis Physician Services has ignored the "total compensation limitation" and has regularly paid the orthopedic surgeons in excess of the national 90th percentile and in excess of the Southern 90th percentile as reported by MGMA[6] for such specialties.

### Excessive Payments to the Orthopedic Surgeons

86.     On January 10, 2015, Piedmont Orthopedics Associates held their "Annual Partners' Meeting" at Greenville Country Club. In attendance were the orthopedic surgeons of POA and executives of Bon Secours Medical Group and Bon Secours St. Francis Health System.

87.     At this meeting, executives of the Bon Secours Defendants distributed the "Piedmont Orthopaedic Associates Financial Summary Sept 2013-Aug 2014." They also distributed the "Piedmont Orthopaedic Associates Financial Summary Sept 2014-Nov 2014."

88.     These Financial Summary reports reveal the excessive compensation paid by the Bon Secours Defendants to the orthopedic surgeons.

89.     Each year from 2008 through the present, the orthopedic surgeons have been paid excessive amounts in relation to their collections, productivity, and MGMA benchmarks. Each year the orthopedic surgeons have shared in a $4 million supplemental bonus payment that was not commercially reasonable and not based on legitimate performance criteria. Each year the surgeons have shared in a bonus pool calculated in part based on revenues

---

[6] Each year Medical Group Management Association ("MGMA") surveys medical practices nationally to obtain the most recent physician compensation and production data. The MGMA Physician Compensation and Production Surveys are leading benchmarking resources for physician compensation in the United States.

from their referrals of patients for laboratory, physical therapy, radiology and other ancillary services to the hospital system.

90.    For example in Fiscal Year (FY) 2014, overall the orthopedic surgeons generated collections of approximately $14.29 million. Yet they were paid $17.91 million. 14 of the 16 orthopedic surgeons were paid at levels far in excess of the value of their personal services as measured by collections. 14 of the 16 orthopedic surgeons were paid at levels exceeding the national 90th percentile compensation to collections ratios according to MGMA data.

91.    The following provides examples of excessive payments to the orthopedic surgeons. The physician compensation and productivity percentiles cited below are based on surveys published by MGMA using national data for 2014.

**Dr. Jennings**

92.    For example, in FY 2014 ending August 31, 2014, Dr. Jennings, a hip and joint orthopedic surgeon, was paid approximately $1.80 million. His compensation exceeded the national 90th percentile for hip and joint orthopedic surgeons ($1,116,691.41) by approximately $587,000.00. His compensation exceeded the Southern 90th percentile ($1,217,315.68) by approximately $487,000.00.

93.    In FY 2014 the collections for Dr. Jennings' services totaled $1,418,093.72. His compensation to collections ratio was approximately 1.27----exceeding the national 90th percentile of .96. His collections per wRVU were approximately $77.39 ---placing him between the national 25th percentile ($68.88) and the national median ($80.99).  Yet his compensation per wRVU was approximately $98.07---just under the national 90th percentile of $105.42.

**Dr. Kavolus**

94.    For Fiscal Year (FY) 2014 ending August 31, 2014, Dr. Kavolus, a hip and joint orthopedic surgeon, was paid approximately $1.73 million. His compensation exceeded the national 90th percentile for hip and joint orthopedic surgeons ($1,116,691.41) by approximately $618,000.00. His compensation exceeded the Southern 90th percentile compensation ($1,217,315.68) by approximately $517,000.00.

95.    His compensation to collections ratio was approximately 1.26----exceeding the national 90th percentile of .96. His collections per wRVU were $78.11---placing him between the national 25th percentile ($68.88) and the national median ($80.99).  Yet his compensation per wRVU was approximately $98.07---just under the national 90th percentile of $105.42.

**Dr. Ridgeway**

96.    For Fiscal Year (FY) 2014 ending August 31, 2014, Dr. Ridgeway, a hip and joint orthopedic surgeon, was paid approximately $1.22 million. His compensation exceeded the national 90th percentile ($1,116,691.41) and exceeded the Southern 90th percentile ($1,217,315.68) for hip and joint orthopedic surgeons.

97.    While paid in excess of the national 90th percentile, the collections for Dr. Ridgeway's services totaled $990,984.11---between the national 25th percentile ($819,680.43) and national median ($1,027,348). His compensation to collections ratio was approximately 1.23----exceeding the national 90th percentile of .96. His collections per wRVU were $79.44, placing him between the national 25th percentile ($68.88) and the national median ($80.99). Yet his compensation per wRVU was approximately $98.07---just under the national 90th percentile of $105.42.

### Dr. Tollison

98.    For Fiscal Year (FY) 2014 ending August 31, 2014, Dr. Tollison, a foot and ankle orthopedic surgeon, was paid approximately $1.50 million. His compensation exceeded the national 90th percentile ($821,685.66) by approximately $677,000.00 and exceeded the Southern 90th percentile compensation ($1,096,987.75) by approximately $401,000.00.

99.    His compensation to collections ratio was approximately 1.36----exceeding the national 90th percentile of .83. His collections per wRVU were $72.02---placing him just above the national 25th percentile ($69.31). Yet his compensation per wRVU was approximately $98.07---above the national 90th percentile of $84.43.

### Dr. Womack

100.    For Fiscal Year (FY) 2014 ending August 31, 2014, Dr. Womack, a foot and ankle orthopedic surgeon, was paid approximately $1.28 million. His compensation exceeded the national 90th percentile ($821,685.66) by approximately $460,000.00 and exceeded the Southern 90th percentile compensation ($1,096,987.75) by approximately $185,000.00.

101.    In FY 2014, his compensation to collections ratio was approximately 1.39----far above the national 90th percentile of .83 according to MGMA data. His collections per wRVU were $70.38---placing him at the national 25th percentile ($69.31). Yet his compensation per wRVU was approximately $98.07---above the national 90th percentile of $84.43 according to MGMA data.

### Dr. Baumgarten

102.    For Fiscal Year (FY) 2014 ending August 31, 2014, Dr. Baumgarten, a sports medicine orthopedic surgeon, was paid approximately $1.70 million. His compensation

exceeded the national 90th percentile ($1,104,664.36) by approximately $600,000.00 and exceeded the Southern 90th percentile ($1,196,284.55) by approximately $508,000.00.

103.   In FY 2014, his compensation to collections ratio was approximately 1.21----far above the national 90th percentile of .86. His collections per wRVU were $81.34---below the national 25th percentile ($85.76) for sports medicine orthopedic surgeons. Yet his compensation per wRVU was approximately $98.07---nearly at the national 90th percentile ($101.87).

### Dr. Vann

104.   For FY 2014 ending August 31, 2014, Dr. Vann, a sports medicine orthopedic surgeon, was paid approximately $1.83 million. His compensation exceeded the national 90th percentile ($1,104,664.36) by approximately $726,000.00 and exceeded the Southern 90th percentile compensation ($1,196,284.55) by approximately $635,000.00.

105.   In FY 2014, his compensation to collections ratio was approximately 1.22----far above the national 90th percentile of .86. His collections per wRVU were $80.02---below the national 25th percentile ($85.76) for sports medicine orthopedic surgeons.  Yet his compensation per wRVU was approximately $98.07---nearly at the national 90th percentile of $101.87.

### Dr. Koch

106.   For Fiscal Year (FY) 2014 ending August 31, 2014, Dr. Koch, a sports medicine orthopedic surgeon, was paid approximately $492,000. He worked only 5,017 wRVUs and his collections per wRVU were $77.69---placing him at the national 10th percentile for

sports medicine orthopedic surgeons ($75.52). Yet his compensation per wRVU was approximately $98.07---just under the national 90th percentile ($101.87).

107. In FY 2014, the collections for Dr. Koch's services totaled $389,835.21. His collections were below the national 10th percentile ($455,926.20). His compensation to collections ratio was approximately 1.26----far above the national 90th percentile of .86 according to MGMA data.

### Dr. Paylor

108. For FY 2014 ending August 31, 2014, Dr. Paylor, a sports medicine orthopedic surgeon, was paid approximately $856,000. He worked approximately 8,726 wRVUs---placing him between the national 25th percentile and national median. His collections per wRVU were $80.07---placing him between the national 10th percentile and 25th percentiles for sports medicine orthopedic surgeons. Yet his compensation per wRVU was approximately $98.07---just under the national 90th percentile ($101.87).

109. In FY 2014, the collections for Dr. Paylor's services totaled $698,662.11---below the national 25th percentile ($725,938.87). His compensation to collections ratio was approximately 1.22----far above the national 90th percentile of .86.

### Dr. Lucas

110. For FY 2014 ending August 31, 2014, Dr. Lucas, an orthopedic spine surgeon, was paid approximately $999,000. In FY 2014, the collections for Dr. Lucas' services totaled $684,923.29---between the national 10th percentile and 25th percentile. His compensation

to collections ratio was approximately 1.46----far above the national 90th percentile of 1.06 according.

111.   He worked 10,189.28 wRVUs---placing him between the national 10th percentile and 25th percentile for spine surgeons.

112.   His collections per wRVU were $67.22---right at the national 10th percentile ($66.56). Yet his compensation per wRVU was approximately $98.07---right at the national 90th percentile ($99.67).

## Dr. Van Pelt

113.   For FY 2014 ending August 31, 2014, Dr. Van Pelt, an orthopedic spine surgeon, was paid approximately $1.16 million. In FY 2014, the collections for Dr. Van Pelt's services totaled $794,725.36. His collections placed him between the national 10th percentile and 25th percentile for spine surgeons. Yet his total compensation placed him between the national 75th and 90th percentiles.

114.   His compensation to collections ratio was approximately 1.46----far above the national 90th percentile of 1.06.

115.   He worked 11,839.37 wRVUs---placing him just over the national median for spine surgeons (11,586.20).  Yet his total compensation placed him between the national 75th and 90th percentiles.

116.   His collections per wRVU were $67.13---right at the national 10th percentile ($66.56). Yet his compensation per wRVU was approximately $98.07---right at the national 90th percentile ($99.67).

## Dr. Batson

117.    For FY 2014 ending August 31, 2014, Dr. Batson, an orthopedic hand surgeon, was paid approximately $655,000. In FY 2014, the collections for Dr. Batson's services totaled $583,323.42 or just above the national 10th percentile ($559,481.38).

118.    His compensation to collections ratio was approximately 1.12----above the national 90th percentile of .97 according to MGMA data.

119.    His collections per wRVU were $87.39---just over the national 25th percentile ($82.23) for hand surgeons. Yet his compensation per wRVU was approximately $98.07---just under the national 90th percentile ($102.03).

**Dr. Tanner**

120.    For FY 2014 ending August 31, 2014, Dr. Tanner, an orthopedic hand surgeon, was paid approximately $697,000. In FY 2014, the collections for Dr. Tanner's services totaled $562,234.90 or just above the national 10th percentile ($559,481.38).

121.    His compensation to collections ratio was approximately 1.24---above the national 90th percentile of .97.

122.    His collections per wRVU were $79.15---just under the national 25th percentile ($82.23) for hand surgeons. Yet his compensation per wRVU was approximately $98.07---right at the national 90th percentile ($102.03).

123.    His wRVUs of 7,103.16 placed him just over the national 25th percentile (6,819.39). Yet his compensation of approximately $697,000 placed him just under the national 75th percentile ($724,590.75).

**Dr. Jernigan**

124.   For FY 2014 ending August 31, 2014, Dr. Jernigan, an orthopedic shoulder and elbow surgeon, was paid approximately $683,000. In FY 2014, the collections for Dr. Jernigan's services totaled $529,750.56.

125.   His compensation to collections ratio was approximately 1.29. His collections per wRVU were $76.09. Yet his compensation per wRVU was approximately $98.07.

**Supplemental Bonus Payments Have Been Budgeted and Disguised as Revenues**

126.   The "St. Francis Physician Services Piedmont Orthopedic Associates Statement of Revenue & Expense Fiscal Year 2014" confirms supplemental bonus payments of $4,213,333 to the orthopedic surgeons in that year. The bonus payments were budgeted at $351,111.00 per month---apparently based on the prior year's bonus payments to the orthopedic surgeons.

127.   The Statement lists the supplemental bonus payments as "Practice Factor Adjustment." The supplemental bonus payments are listed as revenues for the orthopedic surgeons and included in the total of "Adjusted Net Revenue" for the practice group. Under the category "Year End Financial Performance," the columns are left blank.

128.   The bonus payments were disguised as revenues from physician services. This accounting maneuver was deceptive and inaccurate.

129.   The Statement also confirms that the orthopedic surgeons were also paid "Monthly Productivity Comp" for FY 2014 and lists these payments each month with a total of $5.2 million for the year.

130.   This Statement corresponds to the compensation terms in the Employment Agreements under which each orthopedic surgeon has been paid a base salary, productivity compensation based on wRVUs, and bonus compensation based on net practice revenues plus the $3.95 million supplemental bonus payment.

### The POA Orthopedic Surgeons Do Not Satisfy "Group Practice" Exception Under *Stark* Laws

131.   *Stark* laws provide certain exceptions for group practices if they comply with federal requirements. The terms of employment and compensation for the orthopedic surgeons do not satisfy the "group practice" exception under *Stark* laws.

132.   First, each of the orthopedic surgeons has been an employee of the hospital system. The applicable exception under *Stark* laws is the employee exception discussed above. The excessive compensation terms have violated federal requirements for employees under *Stark* laws.

133.   Secondly, the hospital system's relationship with the employed orthopedic surgeons does not satisfy the "group practice" exception under *Stark* laws. The orthopedic surgeons have received bonus payments based in part on revenues from their referrals for ancillary services. The in-office ancillary services exception permits physicians in qualifying group practices to refer Designated Health Services ("DHS") within the group. The exception imposes supervision, location, and billing requirements.

134.   Generally, in-office ancillary services must be furnished in either the "same building" where the referring physician or his or her group practice provides professional services, or in a "centralized building" used to provide off-site DHS. 42 C.F.R. §411.355(b)(2).

135.   To qualify under the in-office ancillary services exception, Designated Health Services must be provided personally by the referring physician, a physician who is a member of the same practice group as the referring physician, an individual supervised by the referring physician or another physician in the referring physician's group practice.  42 C.F.R. §411.355(a).

136.   Yet under the bonus terms of the Employment Agreements, in calculating losses or gains of the practice, "Net charges are determined based on actual payments received for that month and YTD as a percentage of gross charges (gross charges produced by physicians, nurse practitioners, physician assistants, physical therapists) as well as in-office laboratory & radiology and other in-office ancillary procedures as they may change from time-to-time." Employment Agreement, Exhibit 4.1.1, Par. 3, page 23. Therefore, net charges included laboratory, radiology, and other in-office "ancillary procedures." The orthopedic surgeons did not perform all of these services. Nor are the surgeons qualified to supervise laboratory or physical therapy services.

137.   The *Stark* law's billing standard for in-office ancillary services requires that the Designated Health Services be billed by one of the following: (1) the physician performing or supervising the service, (2) the group practice of which such physician is a member, or (3) an entity that is wholly owned by the referring or supervising physician or the referring or supervising physician's group practice. 42 C.F.R. §411.355(b)(3).

138.   The employment arrangement with POA surgeons has not satisfied this requirement. Under the terms of the Employment Agreements with each orthopedic surgeon, the hospital system billed and collected all charges for services, not the orthopedic

surgeons or the orthopedic practice group.[7]

## Compliance with *Stark* Is Condition of Each Federal Payment

139.    Compliance with the *Stark* laws is a mandatory condition of healthcare providers' enrollment in federal health care programs, a mandatory condition of every claim submitted by providers to federal health care programs, and a mandatory condition of every payment made to providers by federal health care programs.

140.    Federal health care programs include patients covered under Medicare, Medicaid, or TRICARE in addition to federal employees and retired federal employees.

## Compliance with *Stark* is Condition of Each Medicare Payment

141.    Medicare covers the costs of certain medical services for persons aged 65 years or older and those with disabilities.

142.    Medicare is divided into four parts. Medicare Part A authorizes payment for institutional care, including hospital, skilled, nursing facility, and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Part B authorizes payment for outpatient health care expenses, including physician fees. *See* 42 U.S.C. §§ 1395-1395w-4.

143.    HHS is responsible for the administration and supervision of Medicare. The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS and is directly

---

[7] Each orthopedic surgeon relinquished the right to bill and collect for his or her professional services. "All fees or other income attributable to the professional services rendered by Physician in the course of Physician's employment by Employer shall be the income of the Employer and Physician hereby assigns the same to Employer." Employment Agreement, Par. 2.5. "Employer shall have the right to bill for, collect, and retain any and all revenues for patient care services rendered by Physician hereunder." *Id.*

responsible for the administration of Medicare.

144. CMS makes Medicare payments retrospectively to hospitals for inpatient services. Medicare enters into provider agreements with hospitals to establish the hospitals' eligibility to participate in Medicare. Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

145. Each Defendant has executed at least one provider agreement with CMS in which they agreed to abide by the Medicare laws, regulations and program instructions…" CMS Provider/Supplier Enrollment Application, Forms 855-A and 855-B. In the provider agreement, each Defendant certified its understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law)…" *Id.*

146. Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services provided to those beneficiaries during their hospital stays. *See* 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments electronically on a CMS UB-04 Form.

147. The UB-04 Form contains the following notice in bold capital letters: "THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)."

148.    The UB-04 Form requires the provider to certify the following:

- "Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."
- "For Medicaid Purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws."
- "For TRICARE Purposes: The information on the face of this claim is true, accurate and complete to the best of the submitter's knowledge and belief, and services were medically [sic] and appropriate for the health of the patient."

149.    As a condition of payments by Medicare, CMS also requires hospitals to submit annually a Form CMS-2552, more commonly known as the hospital cost report. A cost report is the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

150.    After the end of each hospital's fiscal year, the hospital files its cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 13959g); 42 C.F.R. § 413.20. Medicare relies upon the cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f) (1).

151.    Each cost report contains mandatory certifications of compliance with *Stark* laws. Each hospital cost report contains a "Certification" that must be signed by the chief administrator of the hospital provider or a responsible designee of the administrator.

152.    For each of the fiscal years between 2012 and the present, each cost report certification page submitted by the Bon Secours Defendants included the following notice:

"Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil, and administrative action, fine and/or imprisonment under Federal law. **Furthermore, if services provided in this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result**." (Emphasis added).

153.    On each cost report for each fiscal year from 2012 through the present, the responsible officer(s) on behalf of the Bon Secours Defendants certified as follows: "I hereby certify that I have read the above statement [paragraph above] and that I have examined the accompanying electronically filed or manually submitted cost report….and that to the best of my knowledge and belief, it [the cost report] is a true, correct, and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. **I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.**" (Emphasis added).

154.    The Bon Secours Defendants were required to certify that their filed cost reports were  (1) truthful, i.e., that the cost information contained in the report is true and accurate, (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions, (3) complete, i.e., that the cost report is based upon all knowledge known to the provider, (4) **that the services provided in the cost report were not linked to illegal remuneration for referrals**, **and (5) that the provider complied with laws and regulations regarding the provision of health care services,**

such as the *Stark* laws.

155.   In the months following the end of each fiscal year, the Bon Secours Defendants submitted annual cost reports to CMS and attested to the certifications stated above. The Bon Secours Defendants submitted cost reports with the certifications stated above for Fiscal Years 2012, 2013, 2014, 2015, 2016, and 2017.

156.   In addition to the in-patient fees billed by hospitals, physicians also separately certify on Form CMS-1500 that he or she "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

### Compliance with *Stark* is Condition of Each Medicaid Payment

157.   Medicaid is a joint federal-state program that provides health care benefits primarily for the poor and disabled. Medicaid is authorized under Title XIX of the Social Security Act and is administered by each State in compliance with Federal requirements specified in the Medicaid statute and regulations. "The States operate Medicaid programs in accordance with Federal laws and regulations and with a State plan that we approve." 66 Federal Register 857.

158.   The federal Medicaid statute sets forth minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§1396, *et seq.*  As part of such minimum requirements, each state's Medicaid program must cover hospital and physician services. *See* 42 U.S.C. § 1396a (10)(A), 42 U.S.C. § 1396d (a)(1)-(2), (5).

159.   The federal matching rate for the South Carolina Medicaid Program is approximately 71 percent.

160.   In South Carolina, provider hospitals participating in the Medicaid Program file annual cost reports with the State's Medicaid agency, or its intermediary, in a protocol similar to that governing the submission of Medicare cost reports.  Medicaid providers must incorporate the same type of financial data in their Medicaid cost reports as contained in their Medicare cost reports.

161.   Within such Medicaid cost reports, hospitals must certify the accuracy of the information provided and certify compliance with Medicaid laws and regulations, including compliance with the *Stark* laws.

162.   The South Carolina Medicaid Program uses the Medicaid patient data in the cost reports to determine the payments due each facility.

163.   The Bon Secours Defendants submitted claims to Medicaid that were based in part on their Medicaid cost reports and their false certifications of compliance with the *Stark* laws. The South Carolina Medicaid Program relied upon such certifications as mandatory conditions of payment before paying such claims.

164.   Although *Stark* originally applied only to Medicare claims, it was later expanded to apply to Medicaid claims. The Medicaid statute imposes limits on referrals and reimbursements similar to *Stark* laws. Specifically, 42 U.S.C. 1396b(s) titled "Limitations on certain physician referrals," provides,

> No payment shall be made to a State under this section for expenditures for medical assistance under the State plan consisting of a designated health service (as defined in subsection (h)(6) of section 1395nn of this title)

furnished to an individual on the basis of a referral that would result in the denial of payment for the service under subchapter XVIII of this chapter if such subchapter provided for coverage of such service to the same extent and under the same terms and conditions as under the State plan.

165.  Subchapter XVIII governs the Medicare program, including *Stark* laws. The substantive prohibitions contained in the *Stark* laws are therefore applicable to claims submitted to Medicaid.

166.  CMS cannot pay federal financial participation funds for services provided under Medicaid if the payment would be prohibited under Medicare due to an illegal referral in violation of *Stark* laws. The only difference between holding a defendant liable for *Stark*-predicated FCA violations based on Medicare claims and those based on Medicaid claims is that the former are submitted to the federal government directly, while the latter are submitted to the states, which in turn receive federal funding to help pay the claims. It does not matter for purposes of the False Claims Act whether a claim is submitted to an intermediary or directly to the United States. *See 31 U.S.C. 3729(b)(2)* (defining an FCA "claim" to include requests for payments submitted "to a contractor, grantee, or other recipient, if the money . . . is to be spent or used . . . to advance a Government program or interest").

167.  Moreover, even if its own Medicaid claims to South Carolina did not create FCA liability, Defendants would still be liable for causing South Carolina to submit a claim in violation of *Stark* laws to the federal government. Causing a third party to present a false claim or use a false record creates FCA liability just as if the defendant had presented or used the claim or record itself. *See 31 U.S.C. 3729(a)(1)(A-B).*

168.    A false claim submitted to the Medicaid program is a false claim presented to the United States. Given the structure of the Medicaid, Medicare, and TRICARE systems, the natural and foreseeable consequence of submitting a false claim to any of them is that the United States will provide funds to pay the false claim. Given the comprehensive funding and reimbursement structure between the states and federal government under the Medicaid scheme, claims that are submitted to Medicaid are claims to the federal government.

**Compliance with *Stark* is Condition of Each TRICARE Payment**

169.    The Bon Secours Defendants also enrolled in and sought payments from the Civilian Health and Medical Program of the Uniformed Services, known as TRICARE Management Activity/CHAMPUS ("TRICARE/CHAMPUS").

170.    TRICARE is a federally funded program that provides medical benefits, including hospital services, to certain relatives of active duty, deceased, and retired service members or reservists, as well as to retirees. TRICARE sometimes provides for hospital services at non-military facilities for active duty service members as well. *See* 10 U.S.C. §§ 1071-1110; 32 C.F.R. § 199.4(a). The Bon Secours Defendants have received revenues from the TRICARE Program.

171.    In addition to individual patient costs, TRICARE pays hospitals for two types of costs, both based on the Medicare cost report: capital costs and direct medical education costs. *See* 32 C.F.R. § 199.6.

172.    A provider seeking reimbursement from TRICARE for these costs is required to submit a TRICARE form, "Request for Reimbursement of CHAMPUS Capital and Direct

Medical Education Costs" ("Request for Reimbursement"), in which the provider sets forth the number of patient days and financial information related to these costs. These costs are derived from the provider's Medicare cost report.

173.    The Request for Reimbursement requires that the provider certify that the information contained therein "is accurate and based upon the hospital's Medicare cost report."

174.    Upon receipt of a provider's Request for Reimbursement, TRICARE or its fiscal intermediary applies a formula for reimbursement wherein the provider receives a percentage of its capital and medical education costs equal to the percentage of TRICARE patients in the hospital.

175.    The Bon Secours Defendants submitted Requests for Reimbursement to TRICARE that were based on their Medicare cost reports. Whenever the Medicare cost reports of the Bon Secours Defendants contained false information or false certifications from which they derived their Requests for Reimbursement submitted to TRICARE, those Requests for Reimbursement were also false.

176.    On each occasion when the Bon Secours Defendants' Requests for Reimbursement were false due to falsity in its Medicare cost reports, the Bon Secours Defendants falsely certified that the information contained in its Requests for Reimbursement was "accurate and based upon the hospital's Medicare cost report."

177.    The Bon Secours Defendants knew that false claims contained in their Medicare cost reports would affect TRICARE/CHAMPUS payments as well and result in damages to the federal government.

## The False Claims Act

178.    The False Claims Act establishes liability, *inter alia,* for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material[8] to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation[9] to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).

179.    The False Claims Act defines "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that…is presented to an officer, employee or agent of the United States…or is made to a contractor, grantee or other recipient, if the money or property is to be spent on the Government's behalf or to advance a Government program, and if the United States Government…provides or has provided any portion of the money or property requested or demanded…or will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31

---

[8] "The term 'material' means having a natural tendency to influence. Or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

[9] The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).

U.S.C. § 3729(b)(2).

180.    Statutory liability under the False Claims Act includes a civil penalty "not less than $5,500 and not more than $11,000" per false claim "plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a).

181.    Under the False Claims Act, "'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and require no proof of specific intent to defraud." 31 U.S.C. § 3729 (b)(1)(A).

182.    In considering the requisite *scienter* which subjects a defendant to liability under the False Claims Act, "no proof of specific intent to defraud" is required.  31 U.S.C. 3729 (b)(1)(B). A defendant is liable for acting in "reckless disregard of the truth or falsity of the information" or acting in "deliberate ignorance of the truth or falsity of the information." 31 U.S.C. 3729 § (b)(1)(A).

## Count I---Presenting or Causing False Claims in Violation of 31 U.S.C. § 3729(a)(1)(A) Against All Defendants

183.    Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

184.    In pertinent part, the federal False Claims Act establishes liability for "any person who…knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." *See* 31 U.S.C. § 3729(a)(1)(A).

185.    Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented false claims "for payment or approval" to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

186.    This is a claim for treble damages and penalties under the federal False Claims Act, 31 U.S.C. § 3729, *et seq*.

187.    Through the acts described above, the Bon Secours Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, false claims to officers, employees or agents of the United States Government, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

188.    The United States was unaware of the falsity of the records, statements and claims made or caused to be made by Defendants.  In reliance on the accuracy of the claims, information, records, and certifications submitted by Defendants, the United States paid claims that would not be paid if Defendants' illegal conduct was known.

189.    As a result of Defendants' acts, the United States has sustained damages in a substantial amount to be determined at trial.

190.    Additionally, the United States is entitled to civil penalties for each false claim made or caused to be made by Defendants arising from their illegal conduct as described above.

### Count II--- Use of False Statements in Violation of 31 U.S.C. 3729(a)(1)(B) Against All Defendants

191.    Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

192.    In pertinent part, the False Claims Act Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  *See* 31 U.S.C. § 3729(a)(1)(B).

193.    This is a claim for treble damages and penalties under the federal False Claims Act, 31 U.S.C. § 3729, *et seq*., as amended.

194.    Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements. Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to get false claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B). The records were false in that they purported to show compliance with *Stark* laws.

195.    Defendants knowingly made, used, or caused to be made or used false records or statements with the intent to get or cause these false claims to be paid by the United States.

196.    The United States was unaware of the falsity of the records, statements, certifications, and claims made or caused to be made by Defendants.  The United States paid claims that would not be paid if Defendants' illegal conduct was known.

197.    By virtue of the false records or false claims made by Defendants, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act to be determined at trial.

198.    Additionally, the United States is entitled to civil penalties for each false claim made and caused to be made by Defendants arising from their illegal conduct as described above.

**Count III--- Conspiring to Submit False Claims in Violation of 31 U.S.C. §**

## **3729(a)(1)(C) Against All Defendants**

199.    Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

200.    In pertinent part, the federal False Claims Act establishes liability for "any person who….conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).

201.    This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729, *et seq*., as amended.

202.    Through the acts described above, Defendants acting in concert with each other and other contractors, agents, partners, and/or representatives, conspired to knowingly present or cause to be presented, false claims to the United States and knowingly made, used, or caused to be made or used, false records and statements, and omitting material facts, to get false claims paid or approved.

203.    Defendants conspired to withhold information regarding excessive and illegal payments to physicians who were in a position to refer and/or influence referrals of Medicare, Medicaid, and TRICARE patients and federal employees or retired federal employees to the hospital system.

204.    As a result, the United States was unaware of the false claims submitted and caused by Defendants and the United States paid claims that would not be paid if the Defendants' illegal conduct was known to the United States.

205.    By reason of Defendants' acts, the United States has been damaged in a substantial amount to be determined at trial.

206.    By virtue of Defendants' conspiracy to defraud federal health care programs, the

United States sustained damages and is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties for each violation.

## Count IV---Submission of Express and Implied False Certifications in Violation of 31 U.S.C. § 3729(a)(1)(B) Against All Defendants

207.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

208.   In pertinent part, the False Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *See* 31 U.S.C. § 3729(a)(1)(B).

209.   Compliance with *Stark* laws was an explicit condition of each payment under federal health care programs. For each of the years between 2012 and the present, Defendants explicitly and implicitly certified compliance with *Stark* laws.

210.   Defendants' certifications of compliance with *Stark* laws were knowingly false.

211.   In reliance on the Defendants' express and implied certifications, the United States made payments to Defendants under federal health care programs. If the United States had known that Defendants' certifications were false, the payments would not have been made to Defendants for each of the years in question.

212.   By virtue of the false records, false statements, and false certifications made by Defendants, the United States sustained damages and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## Count V---Knowingly Causing and Retaining Overpayments in Violation of 31

### U.S.C. § 3729(a)(1)(G) Against All Defendants

213.    Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

214.    The False Claims Act also establishes liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *See* 31 U.S.C. § 3729(a)(1)(G).  The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *See* 31 U.S.C. § 3729(b)(3).

215.    "An entity that collects payment for [Designated Health Services] that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis." *See* 42 C.F.R. § 411.353(d).

216.    "The OIG may impose a penalty, and where authorized, an assessment against any person…whom it determines…[h]as not refunded on a timely basis….amounts collected as the result of billing an individual, third party payer or other entity for a [DHS] that was provided in accordance with a prohibited referral as described in [42 C.F.R. § 411.353]." *See* 42 C.F.R. § 1003.102(b)(9).

217.    Defendants have knowingly caused and retained overpayments from federal health care programs arising from their violations of *Stark* laws.

218.    By virtue of Defendants causing and retaining overpayments from the Medicare Program, the Medicaid Program, and other federal health care programs, the United States sustained damages and is entitled to treble damages under the False Claims Act, to be

determined at trial, plus a civil penalty for each violation.

### Count VI--- False Record to Avoid an Obligation to Refund Against All Defendants

219.    Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

220.    The False Claims Act also establishes liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *See* 31 U.S.C. § 3729(a)(1)(G).

221.    Defendants knowingly made and used, or caused to be made or used, false records or false statements, i.e., the false certifications made or caused to be made by Defendants in submitting the cost reports, to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

222.    By virtue of the false records or false statements made by the Defendants, the United States sustained damages and therefore is entitled to treble damages, to be determined at trial, plus civil penalties for each violation.

### Prayers for Relief

223.    On behalf of the United States, Relator requests and prays that judgment be entered against Defendants in the amount of the United States' damages, trebled as required by law, such civil penalties as are required by law, for a *qui tam* relator's share as specified by 31 U.S.C. §3730(d), for attorney's fees, costs and expenses as provided by 31 U.S.C. §3730(d), and for all such further legal and equitable relief as may be just and proper.

**Jury trial is hereby demanded.**

This 16th of July 2018.

          _ s/William Nettles_____
          William N. Nettles (Fed. Bar No.: 06586)
          Fran Trapp
          Law Offices of Bill Nettles
          2018 Lincoln Street
          Columbia SC
          29201
          (803) 814-2826

          Lead counsel:
          Bryan A. Vroon, Esq.
          (Motion for *Pro Hac* Admission to be filed)
          Georgia Bar No. 729086
          Law Offices of Bryan A. Vroon, LLC
          1380 West Paces Ferry Road
          Suite 2270
          Atlanta Georgia 30327
          (404) 441-9806
          bryanvroon@gmail.com

### Certificate of Service

      This is to certify that I have this day served a copy of the Relator's Complaint by

depositing a true and correct copy of same by Certified Mail in the United States Mail,

postage prepaid, addressed as follows:

    The Honorable Attorney General Jeff Sessions
    Attorney General of the United States
    Attention: Seal Clerk
    United States Department of Justice
    950 Pennsylvania Avenue NW
    Washington, D.C.  20530-0001

    The Honorable Sherri A. Lydon
    United States Attorney for the District of South Carolina

Wells Fargo Building
1441 Main Street Suite 500
Columbia, SC 29201

This 16th day of July 2018.

　_s/William Nettles_____
William N. Nettles